972 P.2d 167 (1999)
Valda CHIJIDE, M.D., Appellant and Cross-Appellee,
v.
MANIILAQ ASSOCIATION OF KOTZEBUE, ALASKA, Appellee and Cross-Appellant.
Nos. S-7901, S-7931.
Supreme Court of Alaska.
January 22, 1999.
*168 Hugh W. Fleischer, Law Offices of Hugh W. Fleischer, Anchorage, for Appellant and Cross-Appellee.
Douglas Pope, Pope & Katcher, Anchorage, for Appellee and Cross-Appellant.
Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE and BRYNER, Justices.

OPINION
FABE, Justice.

I. INTRODUCTION

Dr. Valda Chijide, a former physician at a medical center run by Maniilaq Association, sued Maniilaq on claims arising out of its decision to end her employment. The superior court granted Maniilaq's motion for summary judgment on Chijide's request for injunctive relief and on her claims that Maniilaq's actions violated her due process rights and the covenant of good faith and fair dealing. The court decided, however, that Maniilaq had failed as a matter of law to give Chijide timely notice of its intent not to renew her contract. Both parties appeal. We affirm the superior court's summary judgment rulings in Maniilaq's favor and reverse its ruling for Chijide.

II. FACTS AND PROCEEDINGS

Maniilaq, a private nonprofit corporation, operates a medical center in Kotzebue. In September 1990 Chijide signed a one-year employment contract with Maniilaq to work as a staff physician at the medical center. The parties renewed the contract in September 1991 and again in September 1992. The final contract provided that Chijide's employment would "terminate" on September 30, 1993.

A. Relevant Provisions of the Employment Contract

The contract between the parties contained several provisions that are important to this appeal. First, it specifically addressed the renewal process. Paragraph 15 indicated that Maniilaq had the right not to renew Chijide's employment for any reason, as long as it provided her with sixty days' notice.
In paragraphs 14A and B, the contract allowed Maniilaq to terminate Chijide's employment with or without cause. If Maniilaq dismissed Chijide without cause, the contract required it to provide her with ninety days' written notice and to pay her any compensation still owed. In contrast, Maniilaq could terminate Chijide for good cause without *169 written notice and "with pay only to the date of such termination."
The contract also stated that Maniilaq's personnel policy would apply to the terms of Chijide's employment "except where superseded by specific contract provisions." Maniilaq's Personnel Policies and Procedures Manual provided grievance and appeal procedures for any employee aggrieved by working conditions or relations.

B. Chijide's Employment at Maniilaq

When Chijide began working for Maniilaq, Dr. Janette Shackles was also a staff physician at the medical center. Soon thereafter, however, Shackles became the clinical director of the medical center, a position in which she supervised Chijide. Chijide began to experience difficulties working with Shackles.
In February 1992 Chijide sent a memorandum to Shackles entitled "Benign Neglect and Failure to Communicate." She complained that "[f]or the past several months," Shackles had repeatedly kept her "uninformed about the dates and times of certain vital meetings involving medical staff" and listed meetings that she had missed as a result of Shackles's "benign neglect." Shackles responded to Chijide's memorandum, explaining the circumstances surrounding the missed meetings and noting that "[w]e have a serious communication problem and you are very much a part of it.... I would like to meet with you and resolve this problem as soon as possible. Please let me know when you[`re] ready to talk." Chijide did not respond to Shackles's invitation to discuss their communication problems.
Through a memorandum to Maniilaq's president, Chijide filed a grievance against Shackles in May 1992, charging that she had "repeatedly received discriminatory and unfair treatment from [her]." Chijide alleged that Shackles had failed to inform her of important meetings, had unfairly denied her leave, and had purposely assigned her an unreasonable work schedule. In June, Jan Harris, Maniilaq's interim president, replied to Chijide's grievance. She found no conscious intent on Shackles's part to exclude Chijide from meetings and no apparent scheduling bias against her. She also found that Chijide was not being denied leave in a discriminatory manner. To address Chijide's concerns, however, Harris decided that staff would receive more formal notice of meetings and that physician coverage would be evaluated. Harris concluded by informing Chijide that if she accepted her resolution of the grievance by signing the reply, it would be considered closed. Chijide neither signed Harris's reply to indicate that she accepted the grievance resolution nor appealed Harris's decision.
Chijide filed a second grievance against Shackles in November 1992. She claimed that her previous grievance "was ineptly handled and doomed from the start," and that since the earlier grievance her relationship with Shackles "ha[d] gone from bad to worse." She also described several examples of Shackles's alleged discriminatory treatment. Frank A. Kramer, the hospital administrator, replied to this grievance in December. He did not find anything inappropriate in Shackles's conduct as described by Chijide and found "no conscious effort" by Shackles to exclude Chijide from meetings or assignments. Observing that the grievance appeared to stem from miscommunication between Shackles and Chijide, he recommended first, that the medical staff discuss how to best disseminate information in the hospital, and second, that Chijide and Shackles "establish an open line of communication."
In a letter to Suzy Erlich, president of Maniilaq, Chijide appealed Kramer's grievance resolution, charging that it "was totally unacceptable and thus, accomplished nothing." Chijide received no response to the letter for several months. In March 1993 Kramer gave Chijide the paperwork with which to pursue her grievance further, but she declined to do so. Chijide later explained in a deposition why she decided not to pursue the grievance: "it was apparent to me ... that the process did not work and it appeared to me it was a corrupt process, if they did not like you that they were not going to process your grievance appropriately."
*170 In March 1993 Shackles gave Chijide a "written reprimand for willfully disobeying a directive." This memorandum was based on Shackles's charge that Chijide had inappropriately refused to make a scheduled clinical visit to the village of Kiana, claiming that it was too cold for travel when, in fact, the weather was suitable for travel. Chijide wrote to Kramer on March 23, asserting that the reprimand was unjustified and requesting that it be removed from her file. Kramer treated Chijide's letter to him as a grievance, which he resolved by finding that the reprimand was proper. Chijide did not pursue this grievance further.
On July 6, 1993, Chijide notified Maniilaq that she wished to renew her contract. On July 9 Shackles wrote a letter to Maniilaq's director of personnel, Carolyn Smith, in which she discussed the "persistent hardships" experienced in working with Chijide and requested that Maniilaq not renew Chijide's contract. In a letter dated July 30, Maniilaq notified Chijide that it would not be renewing her contract. Chijide received this letter on August 2. She left Maniilaq when her contract ended, on September 30, 1993.

C. Court Proceedings

On September 27, 1993, Chijide filed a complaint in the superior court against Maniilaq. In her first count, she requested an injunction requiring Maniilaq to retain her in her present position and sought damages for back pay and pain and suffering. Her second count included four claims: (i) that Maniilaq failed to give notice of nonrenewal at least sixty days prior to the contract's expiration; (ii) that Shackles, as Maniilaq's agent, intentionally inflicted emotional distress upon Chijide; (iii) that Maniilaq violated her due process rights; and (iv) that Maniilaq breached the covenant of good faith and fair dealing.
Maniilaq moved for summary judgment on all of Chijide's claims. In April 1996 the court granted its motion with respect to Chijide's request for injunctive relief and her claim for intentional infliction of emotional distress.[1] The court denied summary judgment to Maniilaq on the notice of renewal claim; it found that Maniilaq failed to give timely notice as required by the contract and ruled that it would treat Chijide's dismissal as a termination without cause under paragraph 14A of the contract.
In May 1996 the court granted summary judgment to Maniilaq on Chijide's remaining claims. It concluded that Chijide's due process rights were limited to the ninety days' notice requirement because the contract expressly provided that Maniilaq could terminate her employment without cause. Similarly, in discussing the covenant of good faith and fair dealing claim, the court ruled that an employer does not violate the covenant by terminating an employee without cause where the employment contract specifically permits no-cause termination.

III. DISCUSSION

A. Standard of Review

This court reviews a grant of summary judgment de novo. See Ramsey v. City of Sand Point, 936 P.2d 126, 129 (Alaska 1997). We will affirm the grant if, construing all reasonable inferences in favor of the nonmoving party, there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. See id.

B. Direct Appeal

1. Did the court err in granting summary judgment to Maniilaq on Chijide's due process claim?

Chijide raises several due process arguments on appeal. Arguing that Maniilaq is a public entity under the rationale of Storrs v. Lutheran Hospitals & Homes Society of America, Inc., 609 P.2d 24, 28 (Alaska 1980), Chijide first claims that she had a property interest in her job and that Maniilaq therefore violated her due process rights by ending her employment without notice and a hearing. Assuming arguendo that Maniilaq is a public entity, we nevertheless disagree *171 with Chijide's contention that she was denied due process.
Chijide initially suggests that the rule established in Storrs required Maniilaq to give her notice and a hearing prior to ending her employment. In that case, we ruled that a quasi-public hospital had to comply with due process before terminating a doctor's hospital privileges. See Storrs, 609 P.2d at 28. Implicit in the reasoning of that decision was our view that when a quasi-public hospital that is the only hospital in a given location deprives a doctor of staff privileges and thus effectively prevents him or her from practicing medicine, the hospital is depriving the doctor of a valuable property interest. See id. at 28 (citing Anton v. San Antonio Community Hosp., 19 Cal.3d 802, 140 Cal.Rptr. 442, 567 P.2d 1162, 1174 (1977) (stating that "the essential nature of a qualified physician's right to use the facilities of a hospital is a property interest which directly relates to the pursuit of his livelihood")).
It is unclear from Chijide's briefing why she believes Storrs would require a hearing in this case. To the extent she argues that Storrs stands for the proposition that all doctors who work for quasi-public hospitals have a property interest in their job, she is incorrect. The Storrs opinion made no such assertion. Neither does Storrs stand for the view that all quasi-public hospitals are required to provide doctors with a hearing before terminating their employment, even when the doctors involved have no property interests in their jobs. Because we reject Chijide's suggestion that Storrs itself required Maniilaq to provide her with notice and a hearing in this case, we proceed to analyze our other decisions discussing employees' due process rights.
Both the federal and state constitutions provide that the state cannot deprive citizens of life, liberty, or property without due process of law.[2] However, the protections of due process apply only when an individual has a life, liberty, or property interest to protect. See, e.g., Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (stating that "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property"); Szejner v. University of Alaska, 944 P.2d 481, 486 (Alaska 1997) (stating "[f]or due process to be implicated, there must be a liberty or property interest sufficient to warrant constitutional protection"). Under both federal and Alaska constitutional law, an employee has a property interest in his or her job only when he or she has a legitimate expectation of continued employment. See, e.g., Roth, 408 U.S. at 577-79, 92 S.Ct. 2701; Ramsey v. City of Sand Point, 936 P.2d 126, 131-32 (Alaska 1997). As a result, both our courts and federal courts have held that employees who have tenure or who can be fired only for cause have property interests in their jobs. See, e.g., Odum v. University of Alaska, Anchorage, 845 P.2d 432, 433 (Alaska 1993) (stating that tenured professor was entitled to due process); Storrs v. Municipality of Anchorage, 721 P.2d 1146, 1148 (Alaska 1986) (employee could be dismissed only for just cause); Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (employee could be dismissed only for just cause); Perry v. Sindermann, 408 U.S. 593, 601-02, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (stating that tenure would provide employee with property interest in his or her job).
Chijide did not have a property interest in her job per se because she had no legitimate expectation that her employment would continue indefinitely. First, her contract provided that Chijide could be fired at any time without cause. Second, unlike a tenured employee, Chijide worked under a year-to-year contract that Maniilaq could choose to renew or not renew for any reason. See Roth, 408 U.S. at 578, 92 S.Ct. 2701 (stating that employee whose contract ended at a fixed date and did not provide for renewal absent sufficient cause had no protected *172 property interest in employment). The fact that Maniilaq had renewed the contract in past years is not enough to convert Chijide's concern that she be rehired into a legitimate expectation that she would be retained. See Martin v. Unified School Dist. No. 434, 728 F.2d 453, 455 (10th Cir.1984); see also Roth, 408 U.S. at 577, 92 S.Ct. 2701 (stating that for a benefit to be considered a property interest under the constitution an individual must have a "legitimate claim of entitlement to it").
But, although Chijide did not have a property interest in her job per se, she did have a property interest in continued employment for the sixty and ninety days' notice periods incorporated into her contract. See Breeden v. City of Nome, 628 P.2d 924, 926 (Alaska 1981). Because we conclude below that Maniilaq complied with the notice requirements as a matter of law, we hold that it did not violate Chijide's rights by ending her employment.
Chijide argues next that Maniilaq violated her due process rights by failing to follow its own procedures in resolving her grievances against Shackles. She appears to contend that the failure to resolve the difficulties between herself and Shackles resulted in her being terminated for cause upon Shackles's recommendation. Because Maniilaq did not provide her with a hearing prior to the termination, thus giving her the opportunity to contest Shackles's evaluation of her performance, Chijide claims that she was not afforded due process. We reject Chijide's argument because we disagree with her premise that Maniilaq fired her for cause.
Chijide points to Shackles's July 9, 1993 letter to Carolyn Smith as evidence that her termination was "for cause." The fact that Shackles provided a reason for her recommendation that the hospital decline to renew Chijide's contract does not convert the nonrenewal into a dismissal for cause. Shackles's letter was addressed to Maniilaq, not Chijide. The notification Maniilaq sent to Chijide was unambiguously a notice of non-renewal that gave no cause for ending Chijide's employment. We therefore affirm the superior court's grant of summary judgment on Chijide's due process claims.

2. Did the court err in granting summary judgment to Maniilaq on Chijide's covenant of good faith and fair dealing claim?

Chijide also raises several challenges to the superior court's rejection of her covenant of good faith and fair dealing claim. She first asserts that Maniilaq violated the covenant when it ended her employment because her dismissal was "part and parcel" of the mistreatment that she received during her years working at the hospital under Shackles's supervision. We disagree.
Like all contracts, Chijide's contract with Maniilaq included an implied covenant of good faith and fair dealing. See Ramsey v. City of Sand Point, 936 P.2d 126, 133 (Alaska 1997). This covenant has both subjective and objective elements. See id. The subjective aspect prohibits an employer from terminating an employee for the purpose of depriving the employee of a contract benefit, and the objective aspect requires an employer to act in a manner that a reasonable person would regard as fair. See id. Chijide has not alleged on appeal that Maniilaq ended her employment in order to deprive her of the benefits of her employment contract. Thus, the only question before this court is whether Maniilaq's actions violated the objective aspect of the covenant.
We held in Ramsey that an employer who acts in accordance with the express terms of a contract satisfies the covenant's objective component. See 936 P.2d at 133. The facts of Ramsey provide a helpful analogy to Chijide's situation. After the city of Sand Point terminated Ramsey without investigating his alleged misconduct on the job, he filed suit, arguing in part that the city had violated the covenant of good faith and fair dealing because it treated him unfairly. See id. at 129. Ramsey's contract provided that he could be terminated without cause, as long as he received thirty days' notice and six months' severance pay. See id. at 128. We held that the covenant's objective element could not be "interpreted to prohibit what [was] expressly permitted by Ramsey's contract with the City": termination without cause. Id. at 133. *173 As a result, we concluded that the city had not violated the covenant. See id.
Similarly, Chijide's contract with Maniilaq permitted Maniilaq to refuse to renew her contract for any reason or for no reason at all as long as it provided her with sixty days' notice of its intent not to renew. As a result, Maniilaq did not violate the implied covenant of good faith and fair dealing by failing to renew Chijide's contract.[3]
Relying on the letter Shackles sent to Maniilaq's personnel director, Chijide argues next that she was dismissed for cause, and therefore Maniilaq's personnel policies entitled her to notice of the charges against her and a right to appeal; she appears to allege that the fact that she did not receive these remedies violates the implied covenant. Because Chijide did not make this argument to the trial court, she has waived it on appeal. See Revelle v. Marston, 898 P.2d 917, 927 (Alaska 1995). We would reject this argument even if Chijide had preserved it, however, because, as we explained above, we disagree with her premise that Maniilaq dismissed her for cause.

C. Cross-Appeal

The superior court found, as a matter of law, that Maniilaq's notice of nonrenewal did not satisfy the contract's sixty-day notice requirement and therefore granted summary judgment to Chijide on this issue. Apparently, the court accepted Chijide's argument that language in the contract providing for "at least sixty (60) days" notice meant sixty 24-hour days. Maniilaq argues that this interpretation of the notice provision is contrary to case and statutory law regarding the calculation of time. We agree.
Paragraph 15 of the employment agreement between Maniilaq and Chijide provided that "at least sixty (60) days [before] the date for renewal of this employment contract, Employer shall give Employee notice if Employer intends not to renew said employment contract[.]" Because the contract provided that it terminated on September 30, 1993, the parties agree that the "date for renewal" was October 1, 1993. Chijide asserted that she received notice of nonrenewal at "approximately 5:10 p.m. on August 2, 1993."
In her memorandum to the superior court, Chijide noted that the sixtieth day in advance of October 1 was August 2 but argued that "[b]ecause fractions of a day are not counted," her contract required sixty 24-hour days of notice. She therefore claimed that Maniilaq would have satisfied the contract's notice requirement only if she had received notice "no later than August 1." In making this argument, Chijide relied on cases holding that the law does not consider fractions of a day in calculating time. Maniilaq contends in turn that the rule of ignoring fractional days means that parts of a day count as a full day, and therefore "it is of no importance whether the notice was given at 12:01 a.m. or 5:10 p.m." on August 2.
Having reviewed the case law, we conclude that this doctrine should be interpreted as Maniilaq contends: fractions of a day count as a full day. One of the cases cited by Maniilaq, Maciborski v. Chase Service Corp. of Arizona, 161 Ariz. 557, 779 P.2d 1296 (App.1989), is particularly instructive.
In Maciborski, a purchaser had neglected to make payments on an installment contract. See id. at 1297. On May 28, 1987, Chase, the servicing agent, sent him a notice requiring that he pay by 5:00 p.m. on June 17, 1987. See id. The issue before the court was *174 whether the notice satisfied an Arizona statute requiring that notice be served "at least twenty days prior to the effective date of the forfeiture." Id. The trial court, interpreting the statute as requiring twenty 24-hour days, had ruled that the notice was ineffective. See id. at 1299. The appellate court first established that because the statute referred to a time period preceding an event, the twenty-day period should be computed by counting backward from the date of forfeiture, rather than forward from the day of mailing notice. See id. at 1300. Counting backward from June 17, the date of forfeiture, the twentieth day was May 28, the day of mailing notice. The court then addressed Maciborski's argument that the statute required twenty 24-hour days of notice. It concluded, contrary to Maciborski's assertions, that cases holding that "a partial day may be considered a `day,'" stand for the rule that "the law takes no notice of fractions of a day and deems any fraction of a day to be a `day.'" Id. at 1301 (citations omitted).
We analyze the contract at issue in the same manner as the Maciborski court analyzed the statute at issue in that case. Like the statute, the contract between Chijide and Maniilaq referred to a time period preceding an event, the renewal date of October 1, 1993. Thus, the sixty days should be calculated by counting backwards from October 1, making the sixtieth day August 2. Because the law treats fractional days as full days, Chijide's receipt of the notice at 5:10 p.m. on August 2 satisfied the sixty days' notice requirement.[4]

IV. CONCLUSION

We AFFIRM the superior court's grant of summary judgment to Maniilaq on Chijide's points on appeal and REVERSE its denial of summary judgment to Maniilaq on the timely notice of renewal issue.[5]
BRYNER, Justice, dissenting.
I disagree with the court's summary rejection of Chijide's implied covenant claim.
Chijide's employment contract provided that "Maniilaq Association Personnel Policy shall apply to this contract except where superseded by specific contract provisions." Maniilaq's personnel policies are spelled out in a Personnel Policies and Procedures Manual whose opening paragraph declares that "[t]hese policies establish a means whereby fair treatment is extended to all employees in a uniform and equitable manner." Because Chijide's employment contract incorporated the personnel manual's provisions by reference, those provisions became an integral *175 part of her contract except insofar as they conflicted with specific contract provisions.[1]
Maniilaq's personnel manual strongly encourages open communication among its employees: "Maniilaq Association believes a clear and open channel for the expression of suggestions and complaints is a fundamental principle of sound employee relations." Under the manual, "[a]ll personnel at all levels of Maniilaq are obligated to respect one another's basic human rights and human dignity, and further, must share information in performing Maniilaq's service."[2] The manual also sets forth a detailed grievance process that broadly applies to "[a]ny employee who is aggrieved by an action which relates to working conditions, discrimination, work relations, or personnel policies and procedures[.]" It emphasizes that "[a]ny serious employee complaint, verbal or written, in any form, should be treated with serious consideration as a grievance."
Since no terms of Chijide's employment contract conflict with or supersede the personnel manual's provisions that require all Maniilaq employees to share information, that ensure all employees respect and human dignity, and that grant them the right to "serious consideration" of work-related complaints within the established grievance process, the provisions must be treated as an integral part of the contract.[3] Maniilaq was "bound by the representations contained in th[e] provisions,"[4] and Chijide was entitled to rely on them in forming reasonable expectations as to her rights and obligations as a Maniilaq employee.
As the court acknowledges in the present case,[5] a covenant of good faith and fair dealing is implied into all contracts.[6] The objective component of the covenant requires an employer to treat an employee  even an at-will employee  in an objectively reasonable manner.[7] Of course, the implied covenant "cannot be interpreted to prohibit what is expressly permitted by [Chijide's] contract[.]"[8] Since her contract specified that she was subject to dismissal without cause after ninety days' notice, Chijide could not reasonably expect the implied covenant of good faith and fair dealing to prevent Maniilaq from terminating her without good cause.[9]
But while the contract expressly allowed Maniilaq to dismiss Chijide without good cause, or for no cause in particular, it by no means guaranteed Maniilaq the right to fire her for reasons that would be impermissible under the law, as a matter of public policy, or by her contract terms.[10] To the contrary, because the implied covenant "effectuate[s] the reasonable expectations of the parties,"[11] and because provisions in the personnel manual, by incorporation into Chijide's contract, fell within the boundaries of her reasonable expectations as an employee, the covenant necessarily protected her from a dismissal specifically based on her performance of duties that the manual expressly required or on her assertion of rights that it expressly guaranteed.
I am persuaded that the record, interpreted in the light most favorable to Chijide,[12] raises a genuine issue of material fact as to whether Maniilaq fired Chijide for demanding an "open channel" of communication with *176 her supervisor and asserting her right to have her complaints "treated with serious consideration" within the established grievance process. In my view, firing Chijide for this reason would amount to a breach of the implied covenant.
On February 24, 1992, Chijide sent a memo to her supervisor, Janette Shackles, complaining that Shackles was neglecting to communicate with her and was treating her unfairly. Chijide evidently viewed the memo as an informal complaint, since she advised that she would "initiate disciplinary action," if Shackles failed to take corrective action.[13] Shackles responded to Chijide by memo on March 2, denying Chijide's allegations but confirming that "[w]e have a serious communication problem and you are very much a part of it."
Shackles stated in her memo that she "would like to meet with [Chijide] and resolve this problem as soon as possible." But she left it up to Chijide to take the initiative: "Please let me know when you are ready to talk." Although the personnel manual imposed on Shackles the duty, as Chijide's supervisor, to "make a special effort to resolve the complaint on an informal basis," there is no indication that she took any other affirmative steps to address Chijide's complaint.
In the year that followed, Chijide filed three formal grievances against Shackles; while each grievance dealt with new occurrences, their recurring theme was the ongoing lack of communication between Chijide and Shackles. On May 6, Chijide addressed her first formal grievance to Maniilaq president Marie Greene, alleging "repeated[] ... discriminatory and unfair treatment from Dr. Janette Shackles," and complaining that "the department needs cohesiveness, good, honest and open communication and fairness to all members of the medical staff."[14]
Under the manual's grievance procedures, Greene was obligated to conduct a joint conference with Chijide and Shackles within ten working days after receipt of the grievance and to "render a Grievance Reply" to Chijide within ten working days after the conference.[15] Although Greene evidently met with Chijide and Shackles on May 21, she left office as Maniilaq's president shortly thereafter without replying to the grievance.
On June 5, interim president Jan Harris wrote a memo to Chijide in response to her grievance. Harris apologized, informing her "that recent administrative changes have prevented conclusion of review of [Chijide's] grievance by Marie Greene." Although Harris had not met with Chijide, she informed Chijide that, based on a review of "all documentation and notes" (evidently referring to Greene's notes of the May 21 meeting), she found "no conscious intent on the part of Dr. Shackles to exclude [Chijide] from meetings," "no apparent scheduling bias against [her]," and no apparent discrimination in denying her leave.
To resolve the grievance, Harris proposed that Chijide wait until the arrival of the new hospital administrator, who, Harris hoped, would be able to address such "systems problems" as Chijide's. Chijide did not appeal to the Board of Directors.
*177 Communication problems continued to plague Chijide and Shackles during the ensuing summer. On November 11, 1992, Chijide filed her second formal grievance, this time directing it to the newly appointed hospital administrator, Frank Kramer. Asserting that her prior grievance against Shackles was "ineptly handled and doomed from the start and attributed to the administrative changes occurring at the time," Chijide complained that "the professional relationship between both [Shackles and her] ha[d] gone from bad to worse." She cited five recent incidents to support her claim.
On November 24, Shackles responded to Chijide's memo, basically disputing Chijide's version of the five recent incidents and laying blame on Chijide. Under personnel procedures, Kramer should have convened a conference with Chijide and Shackles by December 4. He failed to do so. Instead, on December 7, he met with Chijide and handed her a memo dated December 4, in which he purported to dispose of her grievance. The memo apologized to Chijide for the time it had taken Kramer to complete his review of her grievance. It also addressed Chijide's specific complaints, finding them unwarranted.
As to Chijide's ongoing complaint regarding the lack of communication and favoritism, Kramer's memo responded:
Though the situation continues to the present, I get the feeling that you are both partially to blame.... I do not think that one or the other bears the greater responsibility for this breakdown, but because of the manner in which it continues to be handled, the problem will not resolve itself without a very concerted effort on the part of both of you.
Indeed, Kramer remarked that "the entire grievance [was] based on a lack of communication between [Chijide] and Dr. Shackles," and that "until this practice [was] alleviated there [would] be no resolution[.]" To resolve the problem, Kramer recommended a sit-down meeting with the entire medical staff to establish "an enhanced procedural system" to disseminate information and a face-to-face meeting between Chijide and Shackles to "establish a[n] open line of communication."
Because Kramer had held no prior conference on her grievance and Shackles was absent from the December 7 meeting, Chijide asked why Shackles was not there. Chijide's insistence on Shackles's presence caused Kramer to summon Shackles, who arrived about an hour later. Kramer conferred briefly with Chijide and Shackles, but they reached an impasse on the ongoing communication problem.[16]
On December 9, 1992, Chijide appealed Kramer's decision to the new hospital president, Suzy Erlich. Chijide received a note acknowledging receipt on December 11 of the appeal. Under the personnel manual, the president was required to reply to the grievance within ten working days. But Chijide heard nothing for three months. During the week of March 13, 1993, she received a call from Erlich, who said she had forgotten about Chijide's grievance and would ask the personnel office to start the process again. On March 19, Kramer brought Chijide additional paperwork, telling her that she should "fill it out to get [her] grievance processed." Nowhere does the personnel manual call for such additional paperwork, and according to Chijide, no such paperwork had previously been required.
By then, the events that led to Chijide's third, and final, formal grievance were already underway. On March 9, 1993, Shackles had placed a written reprimand in Chijide's personnel file alleging that Chijide had, without good cause, refused to fly to Kiana for a scheduled field clinic. On March 23 Chijide responded by filing a grievance with Kramer, denying any inappropriate conduct and requesting that Shackles's letter be removed from her personnel file. According to the personnel manual, Kramer should have convened a conference with Chijide and Shackles within ten working days and issued a decision within ten working days after the *178 meeting. But by April 21  almost a month after she filed her grievance  Chijide still had received no response. She wrote another memo to Kramer, reminding him of her March 23 complaint, suggesting that he had "chosen to ignore it," and asking him to "let [her] know as to [his] next course of action."
Kramer met with Chijide the next day, April 22, and presented her with a written grievance response, which he had dated April 8  two weeks earlier. Although Kramer had not conferred with Chijide and Shackles jointly and he had not met with Chijide at all, he upheld Shackles's letter of reprimand. After he discussed the memo with Chijide and she expressed dissatisfaction, he advised her of her right to appeal to the president. But Kramer's mishandling of her two grievances and Erlich's mishandling of her prior appeal had convinced Chijide that Maniilaq's grievance process was corrupt. She thus declined to press on with the months-old appeal on her second grievance and did not file an appeal on her third grievance.
On July 9, 1993, three days after Chijide notified Shackles that she wished to renew her contract with Maniilaq for another year, Shackles wrote Maniilaq's personnel director to oppose the renewal. Shackles complained that "on several occasions she had found Chijide's attitude and/or behavior disagreeable and inappropriate." She claimed that her efforts to correct the problems had met with failure. Stating that Chijide's attitude had lowered staff morale and had even had an effect on Shackles's ability to recruit new personnel, Shackles pointed out that "[w]e are currently short-staffed.... I must insist [Chijide] be given the required 60-day notification that her contract for the coming year will not be renewed." Though Shackles's memo appears to fall within the category of personnel documents that the personnel manual required Chijide be notified of immediately, Shackles failed to send Chijide a copy of it. On July 30, Maniilaq notified Chijide that her contract would not be renewed.
Viewing the foregoing evidence and related inferences in the light most favorable to Chijide, a reasonable person could easily conclude that Maniilaq had not "treated with serious consideration" Chijide's requests for an open channel of communication between her and Shackles; nor had Maniilaq honored Chijide's procedural rights as set out in its personnel manual; indeed, Maniilaq had significantly mishandled all of Chijide's grievances. And, from the progressively perfunctory manner in which Maniilaq disposed of Chijide's complaints, a reasonable person might also readily infer that Maniilaq came to view Chijide's grievances as a nuisance and fired her for voicing her expectations and asserting rights that Maniilaq had expressly granted her in its manual.
There is, to be sure, an alternative, seemingly more plausible explanation for Chijide's dismissal  an explanation far more favorable to Maniilaq and less charitable to Chijide. But the relative implausibility of Chijide's version is irrelevant at the summary judgment stage of proceedings. Because the record gives rise to a genuine factual dispute as to the reason for Chijide's firing and supports an inference that one potential reason was that she had made herself unwelcome by too vigorously exercising the rights that the personnel manual granted her and encouraged her to use, the plausibility of her version is not an issue of law for the court but an issue of fact for trial. I would hold that Chijide has made a prima facie showing that Maniilaq violated the implied covenant of good faith and fair dealing by firing her for reasons that are objectively unfair.
Accordingly, I dissent.
NOTES
[1] Chijide has abandoned the emotional distress claim on appeal by failing to brief it. See Legge v. Greig, 880 P.2d 606, 609 (Alaska 1994).
[2] The United States Constitution provides that no state "shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Alaska Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." Alaska Const. art. I, § 7.
[3] The dissent suggests that the hospital may have violated the implied covenant of good faith and fair dealing if it decided not to renew Chijide's contract due to her vigorous exercise of the grievance rights outlined in the personnel manual. But this is not the argument made by Chijide on the issue of good faith and fair dealing. Instead, she maintains that Dr. Shackles "was rude toward her" and was "consistently negative and destructive." She complains that although "[f]riendship and companionship should be an integral part of the relationship between co-working physicians[,] ... this responsible and long standing practice was not only not followed but was violated repeatedly and blatantly." Chijide concludes that Dr. Shackles's "wholly unfounded and terribly harmful conduct toward her led to and included her dismissal and thus was a violation of the ... implied covenant." These allegations and the evidence supporting them do not create a genuine issue of material fact on Chijide's claim of a violation of the implied covenant of good faith and fair dealing.
[4] Courts analyzing time provisions in a range of other scenarios have reached conclusions that support this interpretation. See People v. Harvey, 193 Cal.App.3d 767, 238 Cal.Rptr. 516, 518 (Cal. App.1987) (concluding that a motion to continue a hearing set for Monday was properly filed at least two court days before the hearing when the motion was filed on the previous Thursday, and observing that "[i]n computing days, fractions are not counted but are deemed entire days"); Husebye v. Jaeger, 534 N.W.2d 811, 815-16 (N.D. 1995) (concluding that a referendum petition regarding a senate bill was properly delivered within 90 days after the bill's filing, even though the bill was filed at 4:48 p.m. and the petition was submitted 90 days later after 4:48 p.m.; holding that "it is almost universally accepted that, unless concerned with priority between two events occurring on the same day, a day is considered an indivisible unit of time, and fractions of a day are disregarded in computing time"); Cleveland Wrecking Co. v. Indus. Comm'n of Ohio, 35 Ohio St.3d 248, 520 N.E.2d 228, 230 (1988) (holding that a workers' compensation claim filed at 2:12 p.m. on June 11, 1982 was timely, even though the accident occurred on June 11, 1980 before 2:12 p.m.; noting that to compute time based on fractional days "would create a system whereby an accurate record of the exact hour, minute, and second of an occurrence would be necessary to validate claims"); Olson v. Civil Serv. Comm'n, 43 Wash.App. 812, 719 P.2d 1343, 1344 (1986) (affirming "the principle that fractional portions of a day should be disregarded in computing the passage of time").
[5] In her brief, Chijide also contends that the superior court erred in granting summary judgment to Maniilaq on her claim for injunctive relief. Her argument is based on the premise that she was wrongfully discharged. Because we conclude in part III of this opinion that Maniilaq's decision to end Chijide's employment constituted a valid nonrenewal of her contract, we also conclude that Chijide was not wrongfully discharged. We therefore need not consider her claim that specific performance, rather than damages, would have been an appropriate remedy to redress her alleged injury.
[1] See Jones v. Central Peninsula Gen. Hosp., 779 P.2d 783, 787 (Alaska 1989).
[2] This provision is echoed by an express term of Chijide's employment contract, which required her to communicate to Maniilaq "all suggestions and recommendations that will be of mutual benefit to Employer and Employee."
[3] See Jones, 779 P.2d at 787.
[4] Parker v. Mat-Su Council on Prevention of Alcoholism & Drug Abuse, 813 P.2d 665, 666 (Alaska 1991).
[5] See Op. at 172.
[6] See Ramsey v. City of Sand Point, 936 P.2d 126, 133 (Alaska 1997).
[7] Id.
[8] Id.
[9] See id.
[10] See Luedtke v. Nabors Alaska Drilling, Inc. (Luedtke II), 834 P.2d 1220, 1224 (Alaska 1992).
[11] Ramsey, 936 P.2d at 133.
[12] See id. at 129.
[13] Under Maniilaq's personnel manual, the grievance process requires an initial attempt to resolve a problem informally through discussion or an informal written complaint. From there, the process goes through four steps: at steps one and two the employee submits a formal grievance to the employee's immediate supervisor or the division administrator; step three is an appeal to Maniilaq's president; and step 4 is a final appeal to the Board of Directors, with a right to a hearing before its Personnel Committee.
[14] At the time, the position of hospital administrator was vacant; Chijide was thus entitled to file her grievance directly with Maniilaq's president as a step 3 grievance.
[15] A step 2 grievance to the administrator requires the administrator, within ten days, to meet jointly with the complaining party and the subject of the complaint and to follow up with a written response in ten days. The step 3 grievance procedure to the president does not provide for a meeting, only that the president respond with a Grievance Reply, ordinarily based on a review of the administrator's post-meeting findings at step 2. But when the step 3 grievance is based on the absence of an available administrator to receive a step 2 grievance, the grieving party is left with no opportunity for a meeting on the grievance, and the president is left with no report to review. This procedural gap may account for why Greene conducted a meeting with Chijide and Shackles on May 21, even though the step 3 procedure does not expressly mention one.
[16] On December 8, Kramer wrote a second grievance decision. His December 8 decision made no mention of his earlier memo dated December 4. Instead, it simply summarized the December 7 meeting and concluded that "the final problem of communications between [Chijide] and Dr. Shackles remains unresolved."