ANCHORAGE CHRYSLER CENTER,
INC., Appellant,

v.

DAIMLERCHRYSLER MOTORS
CORPORATION, Appellee.

No. S–12702.

Supreme Court of Alaska.

Dec. 11, 2009.

979

Randall G. Simpson and Matthew Singer, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellant.

William D. Falsey and Jeffrey M. Feldman, Feldman Orlansky & Sanders, Anchorage, and Mark T. Clouatre, Wheeler Trigg Kennedy LLC, Denver, Colorado, for Appellee.

Before: MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

An automobile dealer brought an action against an automobile manufacturer, alleging breach of contract, fraudulent misrepresentation, and breach of the covenant of good faith and fair dealing, and seeking a declaratory judgment and damages. The superior court entered judgment dismissing all claims. On appeal, we remanded to the superior court to make additional findings and conclusions. On remand, the superior court again entered judgment in favor of the defendant on all claims. The plaintiff automobile dealer now appeals the superior court's decision on remand. We affirm the superior court's decision on the breach of contract claim, but reverse on the claim for breach of the covenant of good faith and fair dealing and the claim of fraudulent misrepresentation. Accordingly, we remand to the superior court for an award of nominal damages, and to consider whether punitive damages are appropriate for the tort of fraudulent misrepresentation. We also vacate the award of attorney's fees and remand for proceedings to determine prevailing party status, and to reconsider attorney's fees in light of the foregoing.

## II. FACTS AND PROCEEDINGS

### A. Facts

This is an appeal of a superior court decision on a matter that we remanded to the superior court in *Anchorage Chrysler Center, Inc. v. DaimlerChrysler Corp.* (*Anchorage Chrysler Center I* ).[1] We laid out the underlying facts of the case in *Anchorage Chrysler Center I*:[2]

> During the period relevant to this dispute, plaintiff Anchorage Chrysler Center (ACC) operated a dealership selling Chrysler, Plymouth, and Dodge vehicles, all of which were distributed to ACC by defendant DaimlerChrysler Motors Company, LLC (DCMC) (formerly known as DaimlerChrysler Motors Corporation).[3] ACC sold the vehicles out of two adjacent buildings on Fifth Avenue: Plymouths and Chryslers were sold out of one building, and Dodges out of the other. ACC operated the dealership pursuant to "Sales and Service Agreements" between ACC and DCMC.
>
> These sales and service agreements gave DCMC the right to authorize other dealers to sell the same cars in the same locality as DCMC "determines to be appropriate." The other DCMC dealer in Anchorage was Johnson Jeep. The only DCMC models Johnson Jeep carried were Jeep and Eagle.
>
> In the mid–1990s, DCMC developed a merchandise strategy it called Project 2000. Dealers were encouraged to sell Dodge vehicles in facilities that were separate from the facilities used to sell Chrysler, Plymouth, Jeep, and Eagle vehicles. DCMC, ACC, and Johnson Jeep entered into discussions about how to achieve Project 2000's goal of the same dealer selling the Chrysler, Plymouth, Jeep, and Eagle lines. DCMC and ACC began to negotiate what would eventually become a letter agreement between ACC and DCMC under which ACC would not object to Johnson Jeep's selling Chryslers and Plymouths. As part of this letter agreement, DCMC required ACC to rearrange its showrooms so that Dodges would be sold in what had been the Chrysler/Plymouth showroom, with the other lines (including a new Jeep line) moving to the former Dodge showroom. As part of the deal DCMC would also agree to authorize ACC to open a Dodge dealership in Wasilla.
>
> Getting this letter agreement signed involved a long period of negotiation, extending over several years and involving some false starts. One source of contention was the Wasilla part of the deal, which ultimately took the form of a letter of intent that DCMC was required to provide as one of its obligations under the letter agreement. Another concern ACC had (though the degree to which this concern was reflected in the parties' deal is disputed on this appeal) was whether DCMC would establish another Dodge dealership in Anchorage to compete against ACC's lucrative Dodge franchise. In March 1999, as the negotiations began to enter the home stretch, DCMC's in-house lawyer David King sent an email to ACC's lawyer, attaching a rough draft of a Wasilla letter of intent. Under this draft of the letter of intent, ACC could get a dealership in Wasilla if it began constructing the dealership over time periods to be determined (i.e., the draft had blanks for all the milestones). This letter of intent draft also addressed the issue of other Dodge stores in Alaska, by obligating ACC not to protest if DCMC established another dealer selling the same lines as ACC. The cover memo by DCMC's lawyer explained to ACC's lawyer that any disagreement over this language "should be resolved as a result of the understandings already reached. My clients have not informed me of any plans for additional dealerships in Alaska." Later, after DCMC had announced that it would open

**1.** 129 P.3d 905 (Alaska 2006).

**2.** The description of the facts in *Anchorage Chrysler Center I*, in turn, was "drawn primarily from the superior court opinion, which has not been overtly challenged as wrong on the facts." *Id.* at 907.

**3.** The company has changed its name again and is now Chrysler Motors LLC. We use DCMC here for consistency with the superior court's decisions and our opinion in *Anchorage Chrysler Center I*.

another Dodge dealership in south Anchorage, this statement became one basis of ACC's claim that DCMC had promised or represented not to open another Dodge store.

ACC responded by proposing revised language for the letter agreement. The letter agreement proposed by ACC deleted all references to DCMC's providing a letter of intent and required ACC to "commit" to a new Wasilla dealership within five years.[1] ACC also proposed new language that would commit the parties to the proposition that the Project 2000 agreements between ACC, DCMC, and Johnson Jeep "does not include the Dodge franchise"—language apparently intended to insure that Johnson would not get Dodge. On May 21, 1999, DCMC responded with a letter from Carl Fleck, DCMC's regional manager. DCMC said it was unnecessary to add language to the agreement precluding DCMC from giving Johnson Jeep a Dodge dealership: "As to awarding a Dodge Sales and Service agreement to Johnson Jeep, I can confirm that Daimler-Chrysler has no plan to add Dodge to this dealership." This would become another statement used to support ACC's claim that DCMC had at least implicitly promised or represented not to start a new Dodge dealership in Anchorage.

1. This "commitment" by ACC was initially made subject to "viable economic" circumstances, although a few weeks later ACC agreed to drop this particular condition.

The May 21 DCMC letter also seemed to reject ACC's Wasilla proposal. Fleck enclosed another draft of the letter of intent, which was not signed by DCMC but looked ready to be signed by both parties. Under this version of the letter of intent, DCMC promised to award ACC a Wasilla dealership for Dodge and all other DCMC vehicles, provided ACC met certain milestones. Under this draft of the letter of intent, the first milestone—proposal of a suitable site for the dealership—needed to be met by June 2002 (a little more than three years) and ACC had to finish the dealership by July 2004 (a little more than five years).[2] One of the issues in this appeal is whether this May 21 letter of intent was in form and substance the letter of intent contemplated by the letter agreement that was concluded a few days later.

On May 28, 1999, ACC and DCMC had a conference call, attended by Fleck on DCMC's side and by several managers on ACC's side. What happened on the call was disputed at trial. First, ACC asked about the letter agreement's requirement that ACC establish "separate" and "complete" showrooms for Dodge on the one hand and for Chrysler/Plymouth/Jeep on the other. According to the superior court's findings, Fleck told ACC that because ACC already had two showrooms and combined service and parts facilities and staff, the changes needed would be minor. ACC also asked Fleck about Dodge. What was said on this point was hotly disputed at trial. ACC witnesses testified that Fleck responded by promising not to put a new Dodge dealership of any kind in Anchorage. But the superior court found (based on Fleck's testimony) that Fleck made only a "brief reference to Dodge" and "only in the context of what [Johnson Jeep] was to get (or rather to confirm what [Johnson Jeep] would not get)."

2. Unlike DCMC's prior draft, this letter of intent did not contain any language that purported to preclude ACC from opposing DCMC's establishment of competing dealers.

The letter agreement giving rise to this litigation is dated May 26, 1999. ACC signed the agreement on May 28, 1999, after the parties' conference call; DCMC signed it on June 1, 1999.[3] The letter contains three bullet points. The first bullet bestows a Jeep dealership on ACC, contingent on ACC's establishment of "separate" and "complete" facilities. The second bullet says that ACC will not object to DCMC's giving Johnson Jeep the Chrysler and Plymouth franchises (no mention is made of Dodge). The third bullet says DCMC "will provide" ACC with "its standard five year Letter of Intent." Altogether, the three bullets read as follows:

• Subject to [ACC's] meeting [DCMC's] qualification requirements, DCMC will en-

ter into its standard Jeep Sales and Service Agreements with ACC. As a part of meeting DCMC's qualification requirements ACC will establish a complete Chrysler, Plymouth, Jeep ("CPJ") operation in ACC's current Dodge dealership facilities. As a result, ACC will establish a separate Dodge dealership operation with a separate dealer code in ACC's current Chrysler Plymouth dealership facility. ACC may choose to set up a separate legal entity under which the Dodge dealership will operate or ACC may operate each of the two dealerships under ACC's existing corporate entity with separate d/b/a names for the CPJ and Dodge operations.

---

3. According to the terms of the letter agreement, it became effective on June 1, 1999, the date that it was signed by an authorized representative of DCMC. The superior court chose to refer to the letter agreement as the May 28 letter agreement, based on the date ACC signed the agreement. For purposes of clarity, we will continue to refer to the agreement as the May 28 letter agreement.

• ACC understands and agrees that subject to Johnson Jeep meeting DCMC's qualification requirements, DCMC will enter into its standard Chrysler and Plymouth Sales and Service Agreements with Johnson Jeep at Johnson Jeep's current Jeep location. ACC agrees to not protest or oppose this establishment in any administrative, court or other proceeding.

• DCMC will provide You and ACC with its standard five year Letter of Intent giving You and ACC the right to qualify and be approved as a Dodge, Chrysler, Plymouth and Jeep dealership in the Wasilla, Alaska Sales Locality. Such a Letter of Intent will be conditioned upon You and ACC meeting DCMC's standard dealership qualifications applicable to the Wasilla, Alaska Sales Locality, including the requirement of adequate facilities. The Letter of Intent will be drafted to become effective as of the date of the standard Jeep Sales and Service Agreement referenced above.

Soon after signing, the parties disagreed about what changes ACC had to make to its showrooms to make each "complete" and "separate" under the agreement. DCMC wanted separate managers, separate service areas, separate parts counters, separate sales staff, separate financial statements, and separate dealer codes. ACC understood the changeover merely to involve using separate dealer codes, swapping signs, and making other minor modifications.

In September 1999, without making any attempt to create "separate" and "complete" facilities, ACC filed its complaint in this action. DCMC had never sent any Jeeps to ACC, and never (after May 21) sent ACC another letter of intent for a Wasilla dealership. The complaint alleged, among other things: (1) that, by insisting on a significant transformation of ACC as a precondition to receiving Jeeps, DCMC breached the May 28 agreement and violated the duty of good faith and fair dealing; (2) that DCMC misrepresented its intention not to establish a dealer in south Anchorage; (3) that DCMC breached its promise to give ACC five years to establish a dealership in Wasilla; and (4) that a new dealership would violate the agreement and the covenant of good faith and fair dealing. The complaint sought declaratory relief, injunctive relief, and compensatory and punitive damages. Less than two months after the complaint was filed, DCMC formally approved a plan to open a new Dodge store in south Anchorage, although not at Johnson Jeep.

The matter eventually came to a bench trial before Superior Court Judge William F. Morse. He issued findings of facts and conclusions of law rejecting ACC's claims (though one issue on this appeal is whether the opinion actually addresses certain claims), and on this basis entered a judgment dismissing all claims against DCMC. The superior court's rulings will be discussed in detail below, but can be summarized briefly. Rejecting ACC's claim that DCMC breached the contract by failing to provide Jeeps, the court held that the contract required ACC to make at least some changes to its facilities, and that without attempting to make such changes ACC could not complain of any breach by DCMC. On the issue of the new Dodge dealership in south Anchorage, the court rejected ACC's contractual claims after

finding that DCMC never promised to refrain from establishing an entirely new dealership. The court also rejected ACC's claim that DCMC misrepresented its intentions to open a new Dodge dealership, finding that ACC was not justified in relying on the hedged statements made by DCMC, that ACC did not actually rely on these statements, and that the statements were technically true. As to the Wasilla letter of intent, the court found that DCMC, having sent a letter of intent on May 21 (a few days before the letter agreement was signed), was not required to send another letter of intent under the letter agreement, at least when ACC had never requested that DCMC send such a new letter of intent.

After determining that DCMC was the prevailing party, the superior court awarded DCMC twenty percent of the $1,783,513 in attorney's fees that DCMC incurred, for a total award of $356,702.60.

## B. Proceedings

In *Anchorage Chrysler Center I*, ACC appealed the superior court decision on four grounds. First, ACC argued that the superior court erred by not determining what alterations to ACC's facilities were required by the May 28 letter as preconditions for DCMC shipping Jeeps.[4] Second, ACC argued that the superior court erred in finding that the May 28 letter did not include a promise by DCMC to not open a new Dodge franchise in Anchorage and in finding that additional statements by DCMC regarding a new Dodge dealership in Anchorage were not misrepresentations.[5] Third, ACC argued that the superior court erred in finding that the letter of intent contemplated in the May 28 letter was the May 21 letter of intent.[6] Fourth, ACC argued that the superior court erred by failing to discuss ACC's claim for breach of the covenant of good faith and fair dealing.[7]

We considered the four claims and remanded to the superior court to make specific additional findings. First, we instructed the superior court to "determine whether the criteria for issuing a declaratory judgment are satisfied and, if so, decide whether DCMC's demands concerning creating separate dealership operations were in accordance with the May 28 agreement."[8] Second, we instructed the superior court to determine "whether DCMC's alleged oral statements ... were a fraud inducing ACC to enter into the May 28 letter agreement" with particular attention to whether statements that were technically true could nevertheless be considered fraudulent misrepresentation, and to make findings under Section 529 of the Restatement (Second) of Torts.[9] Third, we instructed the superior court to make additional findings regarding the parties' understandings of the letter of intent contemplated in the May 28 agreement, including whether ACC implicitly waived its right to receive the letter of intent.[10] Fourth, and finally, we instructed the superior court to address the claim that DCMC's conduct violated the covenant of good faith and fair dealing.[11]

On remand, the trial court addressed each of the four issues. First, the superior court found that the criteria for issuing a declaratory judgment were satisfied because the parties' discussions about basic principles and requirements were sufficiently detailed to allow the court to ascertain the parties' respective rights and duties. The superior court additionally concluded that DCMC did not breach the agreement because ACC had not taken the minimum steps required to satisfy the condition precedent and trigger DCMC's obligation to provide ACC with Jeeps. Second, on the issue of fraud, the superior court found that statements by

---

4. *Anchorage Chrysler Center I*, 129 P.3d at 910.

5. These claims were listed separately in ACC's opening brief from the first appeal, but we treated them as a single claim in our opinion in *Anchorage Chrysler Center I*. *Id.*

6. *Id.*

7. *Id.*

8. *Id.* at 913.

9. *Id.* at 914–16.

10. *Id.* at 918.

11. *Id.* at 919.

DCMC's representative Fleck, by letter and via conference call, satisfied four of the five elements required to prove a claim of fraudulent misrepresentation. But, because it found that ACC did not show any loss, the superior court concluded that ACC did not satisfy the fifth element and, accordingly, that it had not proved its claim. Third, the superior court found that the "standard five year letter of intent" referenced in the May 28 letter was the letter of intent that Fleck had sent to ACC on May 21. The superior court also found that ACC waived its right to negotiate revisions to the May 21 letter of intent, and that this waiver, combined with ACC's failure to sign the May 21 letter of intent, was a breach of the May 28 agreement. Fourth, the superior court briefly considered each of the three bases offered by ACC as support for its claim, and concluded that DCMC had not violated the covenant of good faith and fair dealing.

In the end, the superior court entered final judgment against ACC and in favor of DCMC on all claims and dismissed all of ACC's claims with prejudice. ACC appeals the superior court's decision on remand.

## III. STANDARD OF REVIEW

Issues of contract interpretation generally present questions of law which we review *de novo*.[12] When the superior court relies on extrinsic testimonial evidence to provide a factual basis for its interpretation of a contract, we apply the clearly erroneous standard in reviewing the court's underlying findings of fact.[13] We review findings of fact by the superior court on issues of misrepresentation under the clearly erroneous standard.[14]

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Declining To Find that ACC's Non–Performance Was Excused by DCMC's Anticipatory Breach.

ACC argues that although the superior court complied with our instructions on re-

mand and issued a declaratory judgment that identified the facility changes that were required by the May 28 agreement, the superior court erred by not additionally finding that DCMC's demands for additional facility changes were an anticipatory breach that excused ACC's performance. ACC claims that the superior court erred in finding that "ACC breached a pre-condition of the May 28 agreement by not proceeding with its version of the required facility changes." ACC also asserts that the superior court erred in "failing to recognize that ACC's duty to perform the new facility changes should have been excused as a matter of law by the unilateral and unreasonable demands of DCMC." According to ACC, the superior court "should have held that DCMC's unreasonable and unilateral demands constitute a repudiation or anticipatory breach of contract" and that "such anticipatory breach gives rise to a claim for damages for total breach and discharged ACC's remaining duties to render performance."

DCMC responds that ACC's anticipatory breach argument is unavailing because (1) it was raised for the first time on appeal, (2) the superior court found that DCMC never communicated a repudiation of the contract, (3) any anticipatory breach alleged by ACC could not have justified ACC's non-performance, (4) DCMC's actions nullified any earlier repudiation, and (5) any duty by DCMC to pay damages for an anticipatory breach was discharged when ACC breached and indicated that it would never perform its obligations.

### 1. The anticipatory breach issue is properly before this court.

DCMC argues that we should not consider ACC's anticipatory breach arguments because "ACC cannot properly advance a theory of anticipatory breach for the first time in

---

**12.** *Rockstad v. Global Fin. & Inv. Co.,* 41 P.3d 583, 586 (Alaska 2002) (citing *Leisnoi, Inc. v. Stratman,* 956 P.2d 452, 454 (Alaska 1998) and *Norton v. Herron,* 677 P.2d 877, 880 (Alaska 1984)).

**13.** *Id.* (citing *Klosterman v. Hickel Inv. Co.,* 821 P.2d 118, 122 (Alaska 1991)).

**14.** *See Cousineau v. Walker,* 613 P.2d 608, 612 (Alaska 1980).

the opening brief of a second appeal, eight years after filing its complaint." ACC responds that, although it has honed its arguments over eight years of litigation, there is nothing new about the anticipatory breach argument.

■ We have held that, in general, "a party may not present new issues or advance new theories to secure a reversal of a lower court decision." [15] We have adopted a liberal approach towards determining whether an issue or theory of a case was raised in a lower court proceeding, however, and will consider new arguments on appeal if they are closely related to the trial court arguments and "could have been gleaned from [the] pleadings." [16] Key words or phrases do not need to appear in the pleadings in order for us to find that an argument was raised prior to the appeal.[17]

■ Here, although ACC did not use the exact terms "anticipatory breach" or "repudiation" prior to this appeal, ACC established the basis for its present argument by alleging—in its complaint and in its first appeal of the superior court's finding—that it was DCMC that first breached the agreement. Additionally, the factual findings made by the superior court in the original hearing and on remand, particularly the findings that led to the declaratory judgment on the terms of the May 28 agreement, provide an adequate factual basis for us to determine whether DCMC's additional demands constitute an anticipatory breach. Because ACC has consistently argued, beginning with its complaint, that DCMC was the first to breach the May 28 agreement and that a declaratory judgment is necessary to establish this breach, and because the superior court has issued a declaratory judgment and made other findings regarding the agreement and the parties' subsequent actions, we conclude that the anticipatory breach argument is properly before this court.

## 2. DCMC's additional demands did not constitute an anticipatory breach of the May 28 agreement.

We instructed the superior court, on remand, to "determine whether the criteria for issuing a declaratory judgment are satisfied and, if so, decide whether DCMC's demands concerning creating separate dealership operations were in accordance with the May 28 agreement." [18] On remand, the superior court concluded that the criteria for issuing a declaratory judgment were satisfied because "[i]t will be useful for the parties to have this dispute resolved so that they may understand how they came to such a misunderstanding and avoid similar controversy in their future dealings." The court then found that, although "[t]he parties never finalized a detailed description of what ACC needed to do to its facilities and operations," "the parties' discussions about basic principles and what would be required were detailed enough to permit the Court to declare what minimum steps ACC needed to take to meet the condition precedent that would trigger DCMC's obligation to deliver Jeeps to ACC." These steps involved changing signage, utilizing separate dealer codes, and upgrading physical facilities and changing staffing to allow each facility to provide service work and parts sales. The superior court also explicitly laid out the actions that ACC was *not* required to take, finding that "ACC would not have to increase the square footage of either of its buildings ... would not have to have a duplicate office staff for the smaller building .... [and] would not have to have a general manager, a sales manager, a service manager, or parts manager for the smaller building." The superior court ultimately concluded that "if ACC had constructed the changes to the facilities and modified its operation as identified above, then ACC would have ... triggered DCMC's obligation to provide ACC with Jeeps, even if DCMC was not fully satisfied with the modifications." The superior court additionally found

**15.** *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985) (citing *O'Neill Inv. v. Illinois Employers Ins.,* 636 P.2d 1170, 1175 n. 7 (Alaska 1981)).

**16.** *Id.*

**17.** *See id.*

**18.** *Anchorage Chrysler Center I,* 129 P.3d 905, 913 (Alaska 2006).

that "both sides became more demanding after 28 May."

ACC argues that although the superior court made correct factual findings, its conclusions of law were in error. ACC claims that its duty to make the modifications to its facilities was excused as a matter of law by DCMC's unilateral and unreasonable demands. This argument is based on the premises that "DCMC's unreasonable and unilateral demands constitute a repudiation or anticipatory breach of contract," and that "such anticipatory breach gives rise to a claim for damages for total breach and discharged ACC's remaining duties to render performance."

DCMC responds to the first premise by arguing that the superior court correctly concluded that DCMC did not announce a "definite and unconditional" intent to repudiate the May 28 agreement. DCMC responds to the second premise by arguing that any anticipatory breach on its part could not have excused ACC's non-performance. DCMC also argues that any anticipatory repudiation was nullified by the parties' subsequent communications, and cannot provide the basis for a claim for damages because the superior court correctly concluded that ACC would never have performed.

We have looked to the Restatement (Second) of Contracts to provide guidance on the requirements for anticipatory repudiation.[19] According to the Restatement,

[a] repudiation is

(a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach . . . , or

(b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.[20]

When the alleged repudiation takes the form of additional demands or requirements from one party, we have stated that

[t]o be a repudiation, "a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." A repudiation could also involve language that clearly manifests an "intention not to perform except on conditions which go beyond the contract[.]" Similarly, to be an anticipatory breach based on a request for additional conditions, "the request must be coupled with an absolute refusal to perform unless the request is granted." [21]

In order to determine that the superior court erred in finding that DCMC did not repudiate the agreement, therefore, we must find that DCMC demonstrated a refusal to perform unless the additional requirements it communicated after the May 28 letter agreement were met.

To support its assertion that "DCMC's inconsistent and onerous demands in the summer of 1999 qualify as an anticipatory breach or renunciation of the contract," ACC points to several instances where DCMC allegedly made additional, unreasonable demands. First, ACC points to comments made at a meeting in July 1999, several weeks after the parties signed the May 28 agreement, when DCMC representatives traveled to Anchorage to discuss the facility requirements. ACC claims that at that meeting "DCMC insisted that it would not give the Jeep line to ACC unless ACC agreed to create two 'exclusive' dealerships at its current location." The trial testimony that ACC cites as support for this assertion, however, includes the testimony of Carl Fleck, DCMC's regional representative, who acknowledged that exclusivity was discussed at the meeting but further claimed that exclusivity was offered only as an opening negotiating position and that DCMC's representatives also indicated a

**19.** *See Drake v. Wickwire*, 795 P.2d 195, 197–98 (Alaska 1990) (citing Restatement (Second) of Contracts §§ 250, 251, 253 (1981)).

**20.** Restatement (Second) of Contracts § 250 (1981).

**21.** *See also K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 715 (Alaska 2003) (quoting

Restatement (Second) of Contracts § 250 cmt. b (1981) and 17A Am.Jur.2d *Contracts* § 738, at 752 (1991)); *see also id.* at 715–16 (concluding that letter from one party's attorney that imposed new restrictions after contract was formed was not repudiation because letter did not convey unequivocal refusal to perform).

willingness to settle for less than that. Fleck characterized the discussion as: "We request that you have this but this is what I will settle for." Fleck described the course of the discussion by stating "[w]e started off talking about what the actual requirements were.... After that we talked about okay, what can we do to make this work and what ... would you ... kind of settle for."

ACC also points to several DCMC documents as support for the assertion that DCMC demanded exclusive facilities. Although these documents do reference DCMC's continued desire for exclusivity and ACC's resistance, none of these documents contradict Fleck's testimony that DCMC would ultimately be willing to be flexible on the issue of exclusivity. The documents referenced by ACC include: a "facility guide" that DCMC faxed to ACC on August 3, 1999 that lists the square footage for the "Dodge exclusive" and "CPJ exclusive" facilities; an internal DCMC memorandum that preceded the July 1999 meeting and that characterized the meeting as an attempt to "make a trip to Anchorage to iron out the details that [ACC] is having difficulty with"; a memorandum that characterizes ACC's position as "objecting to the exclusivity requirements"; and a memorandum that describes a letter sent to ACC asking for its "firm commitment to provide exclusive facilities by September 17, 1999." None of these internal documents may reasonably be interpreted to be a statement that DCMC would not perform under the contract unless ACC agreed to exclusivity.

■ Therefore, the record does not contain support for ACC's assertion that DCMC repudiated the agreement when it made subsequent requests for exclusive facilities. DCMC did not make any statements that, reasonably interpreted, said it would not perform unless ACC created exclusive facilities, and the evidence contains testimony that suggests that the request for exclusivity was an opening bargaining position and that

DCMC made clear that it was willing to negotiate. Because the record does not contain any evidence that DCMC demonstrated a refusal to perform "except on conditions which go beyond the contract,"[22] it was not clear error for the superior court to conclude that DCMC did not repudiate the agreement.

**B. It Was Error To Conclude that ACC Failed To Establish the Loss Element of Its Fraudulent Misrepresentation Claim.**

We determined in the first appeal that the superior court erred as a matter of law in the original hearing by not making findings of fact appropriate to the legal test for fraudulent misrepresentation articulated in the Restatement (Second) of Torts.[23] Specifically, we were concerned that "the superior court did not appear to appreciate that a statement can be literally true and yet still be an actionable misrepresentation."[24] Accordingly, we remanded to the superior court for further consideration of whether DCMC's statements regarding its intention not to place new Dodge dealerships in Anchorage "were a fraud inducing ACC to enter into the May 28 letter agreement."[25] There were two statements by DCMC that the superior court considered on remand: (1) "[a] statement in the May 21, 1999 letter to ACC by DCMC manager Carl Fleck: 'As to awarding a Dodge Sales and Service agreement to Johnson Jeep, I can confirm that DaimlerChrysler has no plan to add Dodge to the [Johnson Jeep] dealership'"; and (2) "[a] statement to ACC on a conference call by the same DCMC manager, the day ACC signed the agreement, allegedly to the effect that DCMC would not establish a Dodge dealership in south Anchorage."[26]

We have identified the elements of intentional misrepresentation as "(1) a misrepresentation of fact or intention, (2) made fraudulently (i.e., with scienter), (3) for the purpose of inducing another to act in reli-

---

**22.** *See id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 250, cmt. b. (1981)).

**23.** *Anchorage Chrysler Center I,* 129 P.3d at 916.

**24.** *Id.* at 915.

**25.** *Id.* at 916.

**26.** *Id.* at 913.

ance, (4) with justifiable reliance by the recipient, (5) causing loss."[27]

On remand, the superior court found that the first four elements of fraudulent misrepresentation were met, and that "[i]f in March or May [DCMC] had told ACC of the imminence of the second Dodge dealer, [ACC] would not have signed the 28 May letter." The superior court also found, however, that ACC did not suffer any loss as a result of DCMC's fraudulent misrepresentation because "[t]he only affirmative steps that ACC took were to change the logos on the floors of the two showrooms and to consult architects." The superior court supported this finding by pointing to the facts that "there was no testimony about the cost of the switch and no reason to believe that ACC did not receive some benefit from the appearance of the new logos" and that "[t]here was no evidence that the architects were hired or performed any work." Accordingly, because it found that ACC failed to prove the necessary fifth element for fraudulent misrepresentation, the superior court found for DCMC.

ACC now argues that although the superior court correctly found on remand that DCMC made statements that were fraudulent misrepresentations and that ACC justifiably relied on these misrepresentations, the superior court erred by finding that ACC did not suffer any loss and by concluding that ACC therefore failed to prove its claim for fraudulent misrepresentation. ACC contends that the superior court erred by considering only reliance damages and not consequential damages in determining whether ACC suffered any losses. In the alternative, ACC argues that it did suffer reliance damages and that, as a result, the superior court erred by not awarding at least nominal damages.

DCMC responds that the superior court properly considered all categories of loss that

ACC could have suffered and correctly found that ACC did not suffer any loss.

We conclude that the superior court properly rejected ACC's claim for consequential damages, but should have awarded nominal damages for losses ACC incurred in reliance on DCMC's misrepresentations.

### 1. The superior court did not clearly err in finding that ACC suffered no consequential losses from DCMC's fraudulent misrepresentations.

ACC argues that the superior court should have considered "those other consequential damages which ACC would not have suffered *but for* DCMC's fraud." (Emphasis in original.) Specifically, ACC argues that "[b]*ut for* DCMC's fraud, ACC would still be the only Chrysler dealer in Anchorage" and that therefore "the Project 2000 deal cost ACC a significant loss of Chrysler sales." (Emphasis in original.)

In general, when reviewing the assessment of damages in tort cases, we apply the rule that "the injured party is entitled to be placed as nearly as possible in the position he would have occupied had it not been for the tortious conduct."[28] These damages can include those costs proximately resulting from—or in consequence of—the defendant's conduct.[29] A plaintiff in a tort action for fraudulent misrepresentation, therefore, may recover damages incurred for losses suffered both in reliance on, and in consequence of, the defendant's tortious action. ACC argues that the superior court violated this principle by basing its conclusions only on the losses ACC incurred in reliance on DCMC's fraudulent statements, and not on additional losses suffered in consequence of DCMC's statements. DCMC responds that the superior court did in fact consider ACC's consequential losses, such as the potential loss of sales caused by increased competition, but found that ACC would have experienced those losses regardless of whether DCMC had made

---

**27.** *Id.* at 914 (citing RESTATEMENT (SECOND) OF TORTS § 525 (1977)).

**28.** *ERA Helicopters, Inc. v. Digicon Alaska, Inc.*, 518 P.2d 1057, 1059–60 (Alaska 1974) (citing *Beaulieu v. Elliott*, 434 P.2d 665, 670–71 (Alaska 1967)).

**29.** *See id.* at 1060 (holding that superior court did not err in instructing jury to consider awarding damages beyond cost of item injured by defendant's negligence, including business interruption damages).

the fraudulent statements and whether or not ACC had entered into the agreement.

It appears that the superior court did consider the losses that ACC alleges it experienced as a result of increased competition from the expansion of Johnson Jeep via Project 2000 to include Chrysler sales, as well as the addition of a new Dodge dealership to the Anchorage region.[30] The superior court found that any lost sales that ACC suffered as a result of this increased competition "would have occurred if Fleck had revealed DCMC's intention to open a second Dodge [dealership] before 28 May and [ACC] had broken off the Project 2000 talks" because "[Johnson Jeep] would have gotten its expanded lines and DCMC would have opened the second Dodge dealership." Thus, the superior court implied, ACC's agreement to participate in Project 2000 as a result of DCMC's fraudulent misrepresentations did not increase the chances that ACC would experience a loss of sales.

 ACC disputes this finding by arguing, based on the testimony of DCMC's regional manager Carl Fleck, that there would not have been a Project 2000 in Anchorage without ACC's consent. The corollary of this argument is that DCMC could not have added additional product lines to Johnson Jeep or added a new Dodge dealership without ACC's agreement to participate in Project 2000. We disagree.

ACC's sales and service agreements with DCMC for sale of the Chrysler, Plymouth, and Dodge product lines all contain a provision that specifies that ACC's right to the product lines is "non-exclusive" and that ACC's designated sales locality "may be shared with other [DCMC] dealers as [DCMC] determines to be appropriate." Therefore, although DCMC appears to have initially sought the approval of all local dealers before implementing Project 2000 in Anchorage, the franchise agreements did not require it to do so.

We addressed the issue of ACC's sales and service agreements with DCMC and their impact on ACC's misrepresentation claims in our opinion in the original appeal.[31] At that time we considered DCMC's argument that the existence of these sales and service agreements made "any oral misrepresentations about new dealerships … irrelevant," but rejected this argument because "an oral statement that would be unenforceable as a promise under the terms of Contract A may yet be a tortious misstatement if it induces the recipient of the statement to enter into Contract B." [32] We now conclude that the facts preclude ACC from establishing a claim for consequential damages under that line of reasoning as well.

None of the agreements that DCMC entered into with the Anchorage dealers in the course of implementing Project 2000 created a legal right on the part of any one dealer to object to an individual agreement between DCMC and any of the other dealers. The record shows that after ACC frustrated an initial attempt by DCMC to get the Anchorage dealers to participate in Project 2000 in 1997, DCMC revised its internal policy so that Johnson Jeep's participation in Project 2000 would not be dependent on ACC's consent. Johnson Jeep's eventual agreement with DCMC in January 1999 did not, in fact, require ACC's consent, and Johnson Jeep and DCMC continued to honor that agreement even after DCMC's separate agreement with ACC unraveled.

Therefore, not only did the sales and service agreement between ACC and DCMC preserve DCMC's right to open new franchises and authorize the sale of additional product lines within the Anchorage region, but the eventual Project 2000 letter agreement between DCMC and Johnson Jeep did not contain any provision making that deal contingent on ACC's consent or approval. Accordingly, ACC never had any legal right to protest DCMC's agreement to add a Chrysler product line to Johnson Jeep. As a result, any loss of Chrysler sales that ACC

---

**30.** ACC did not allege any other specific kinds of consequential losses in its argument on appeal.

**31.** *Anchorage Chrysler Center I,* 129 P.3d 905, 916 (Alaska 2006).

**32.** *Id.*

suffered due to competition from Johnson Jeep would have occurred whether or not ACC had entered into a Project 2000 agreement with DCMC. Because ACC never had a legal right to object to the addition of the Chrysler product line to Johnson Jeep—whether as part of a Project 2000 agreement or not—ACC cannot now claim that any sales loss it suffered as a result of this increased competition was a consequence of DCMC's fraud or ACC's resulting participation in Project 2000. The superior court was correct, therefore, in finding that any losses ACC incurred from competition with other dealerships in the region would have occurred whether or not ACC had entered into the Project 2000 agreement.

### 2. The superior court erred in failing to award nominal damages after ACC showed it incurred losses in reliance on DCMC's fraudulent misrepresentations.

ACC argues, in the alternative, that the superior court should have awarded it at least nominal damages because ACC established that it did suffer some losses in reliance on DCMC's fraudulent misrepresentations. ACC contends that it suffered losses in the form of both the cost of switching the floor logos and the harm from a weakening of ACC's bargaining position. DCMC responds that ACC's argument for nominal damages is meritless because it is raised for the first time on appeal, because the superior court did not commit clear error in finding that ACC failed to prove that it was harmed, and because the superior court was not obligated to award nominal damages. DCMC also argues that ACC is not entitled to remand because the superior court did not abuse its discretion in determining that DCMC was the prevailing party and ACC was not entitled to punitive damages.

As discussed in Part IV.A.1. above, we have adopted a liberal approach towards determining whether an issue or theory of a case was raised in a lower court proceeding; and we will consider new arguments on appeal if they are closely related to the trial court arguments and "could have been gleaned from [the] pleadings."[33] ACC's fifth claim for relief in its complaint includes the assertion that "[ACC] reasonably relied upon [DCMC's] misrepresentations and omissions in agreeing to waive its rights to protest the establishment of a new motor vehicle dealership in [ACC's] relevant market area," and the prayer for relief included requests for "an award of damages in an amount to be determined at the time of trial, but in excess of $75,000.00" and "such other and further relief as the court may deem just and appropriate." Because ACC raised the issue of DCMC's misrepresentations and requested unspecified damages and additional relief in its complaint, ACC's current request for nominal damages is properly before this court.

Whether nominal damages are available to a plaintiff in a case of fraudulent misrepresentation is a question of first impression in Alaska. We have recognized that nominal damages are typically awarded in two situations: (1) as "a 'trifling or token allowance' for a technical invasion of a plaintiff's rights or a breach of a legal duty when no actual injury is shown," or (2) as " 'the very different allowance' made when actual loss or injury is shown, but plaintiff has failed to prove the extent and amount of damages."[34] In holding that nominal damages are an available remedy for false arrest under the first category, we have recognized that "as a matter of law, a plaintiff in a false arrest case need offer no proof of actual damages because injury in the sense of monetary loss is not an element of the tort."[35] In contrast, as discussed above, an actual loss is one of the five required elements for proving a claim of fraudulent misrepresentation.[36] Because a plaintiff in a fraudulent misrepresentation case must show proof of actual loss, the first

**33.** *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985).

**34.** *Zok v. State,* 903 P.2d 574, 577–78 (Alaska 1995) (quoting 1 MARILYN MINZER ET AL., DAMAGES IN TORT ACTIONS § 2.10, at 2–18 (1993)).

**35.** *Id.* at 577 (citing *Ivy v. Wal–Mart Stores, Inc.,* 777 S.W.2d 682, 684 (Mo.App.1989)).

**36.** *Anchorage Chrysler Center I,* 129 P.3d at 914.

category of nominal damages does not apply in this case.

■ Under the second category of nominal damages that we have identified, ACC would have a claim to nominal damages only if it proved that it did suffer a loss but was not able to establish the extent or amount of damages. ACC bases its claim for nominal damages on the costs it incurred in switching the floor logos and on the loss of bargaining power that it suffered by relying on DCMC's misrepresentations. In addressing ACC's claims that it suffered a loss from the costs of switching the logos, the superior court found that "there was no testimony about the cost of the switch and no reason to believe that ACC did not receive some benefit from the appearance of the new logos." However, the lack of testimony on the cost of the switch does not by itself preclude a claim for nominal damages, since an award of nominal damages is appropriate where a party incurs a pecuniary loss of undetermined amount. The superior court additionally found that the newly painted logos may have conferred a benefit on ACC sufficient to make up for any loss suffered.

That ACC might have benefitted from its expenditure is possible, but was not shown. Furthermore, to assume that an offsetting benefit negates the harm ignores opportunity costs: ACC might have had another way to expend those funds that would have benefitted it more.

■ While the changing of the logos was an actual, if unquantified loss, we do not agree with ACC's claim that it suffered a loss from harm to its bargaining position. As is the case with the alleged loss from switching the logos, ACC does not point to evidence to establish the extent of the loss it suffered as a result of diminished bargaining power. In addition, there is no precedent in Alaska for considering a change in bargaining position to constitute in itself a loss in a fraud action. ACC relies on a case from the Illinois Court of Appeals where the court found that "the

distortion of the bargaining process [from the fraud] is itself sufficient to establish damage." [37] The Illinois decision, however, was based on an "unusual aspect" not present in the case at hand: "[the defendant] allegedly engaged in a fraudulent scheme to overcome [the plaintiff's] resistance, even though an honest transaction ... allegedly might have been more advantageous to [the defendant]." [38] The Illinois court concluded that it was appropriate to broaden the inquiry into damages to encompass harm to the plaintiff's bargaining position because the unusual circumstances of the case made it impossible for the plaintiff to argue the benefit of the bargain as the measure of damages. [39]

In the absence of the unusual circumstances at issue in the Illinois case, ACC's reliance on the Illinois decision is misplaced. It would not be appropriate to generally broaden the fifth element of the fraudulent misrepresentation tort by treating changed bargaining position as, in and of itself, an actual loss. In virtually any fraudulent misrepresentation case involving negotiations or a contract, the reliance element will involve the use of misrepresentation to influence what a party consents to do or not do. Equating a compromised bargaining position with actual loss would thus cause the loss and reliance elements of the tort to collapse into a single element. Every time a party could show that it acted in reliance on a fraudulent misrepresentation (the fourth element of the tort), it could automatically assert the misrepresentation harmed its bargaining power and caused a loss (the fifth element). The loss in fraudulent misrepresentation must be a pecuniary loss that is caused by the plaintiff's reliance on the misrepresentation.

In addition, ACC never enjoyed a favorable bargaining position in relation to DCMC because, as discussed above, ACC never had a legal right to oppose the expansion or addition of competing dealerships in the Anchorage area. [40] Therefore, any harm to ACC's bargaining position would have been unlikely to change the outcome of any negotiations with DCMC.

37. *Giammanco v. Giammanco*, 253 Ill.App.3d 750, 192 Ill.Dec. 835, 625 N.E.2d 990, 1001 (1993).

38. *Id.* at 999.

39. *Id.* at 1000–01.

40. *See supra* Part IV.B.1.

ACC further argues that the superior court erred by not awarding nominal damages "so that ACC could vindicate the injustice of its franchisor committing fraud in the course of its day-to-day business, and so that ACC could be deemed the prevailing party for purposes of Civil Rule 82 fees." ACC frames this as a policy question, asking "when a plaintiff proves a case of fraud and shows that it has acted in reliance on that fraud, should the trial court at least award nominal damages and declare the fraud victim the prevailing party?" Were we to adopt the proposed policy, the effect would be to sever the fifth element currently required to prove a claim of fraudulent misrepresentation: loss.[41] ACC does not offer more than cursory support for this extraordinary proposition, however. Although ACC is correct that fraud, including fraudulent misrepresentation, should be discouraged, ACC has not established that the existing test for fraudulent misrepresentation is so flawed that it should be abandoned.

We conclude that it was error to fail to award at least nominal damages for the expenses ACC incurred in switching its floor logos. Although the amount of this loss was undetermined, and likely small, nominal damages should have been awarded. On remand, the trial court will need to also consider how such an award affects prevailing party status and attorney's fees, and will also need to consider whether punitive damages are appropriate. This will be discussed further in Part IV.E below.

## C. DCMC Breached the Covenant of Good Faith and Fair Dealing When It Made Fraudulent Misrepresentations.

In the original appeal in this case we determined that the superior court failed to address ACC's three claims for breach of the covenant of good faith and fair dealing.[42] We described those claims as: "(1) DCMC's failure to notify ACC that it intended to establish a new south Anchorage dealership, (2) its alleged revocation of the Wasilla letter of intent, and (3) its allegedly unreasonable demands for changes in ACC's facilities." [43] Accordingly, we remanded to the superior court to rule on these claims and to "make the factual findings incident to such a ruling." [44]

On remand, the superior court concluded that "DCMC did not violate the covenant of good faith and fair dealing in the revocation of ACC's ability to open a dealership in Wasilla or its ability to receive Jeeps. DCMC acted in bad faith in its nondisclosure of the coming of the second Dodge dealership, but that misconduct did not cause ACC any damage." The superior court also found that these claims "add little to ACC's other claims," and that "ACC's scant treatment of [these claims] at the trial was an implicit recognition that they are not much more than restatements of ACC's main claims."

■■■ We have held that "[t]he covenant of good faith and fair dealing is implied in every contract in order to effectuate the reasonable expectations of the parties to the agreement." [45] The covenant includes subjective and objective elements, both of which must be satisfied.[46] The subjective element "prohibits one party from acting to deprive the other of the benefit of the contract." [47] The objective element "requires each party to act 'in a manner that a reasonable person would regard as fair.' "[48]

In its current appeal, ACC primarily relies on the argument that DCMC breached the

41. *Anchorage Chrysler Center I,* 129 P.3d 905, 914 (Alaska 2006) (citing the Restatement (Second) of Torts § 525 (1977)).

42. *Id.* at 918–19.

43. *Id.* at 918.

44. *Id.* at 919.

45. *Ramsey v. City of Sand Point,* 936 P.2d 126, 133 (Alaska 1997).

46. *McConnell v. State, Dep't of Health & Social Serv., Div. of Med. Assistance,* 991 P.2d 178, 184 (Alaska 1999) (citing *Chijide v. Maniilaq Ass'n,* 972 P.2d 167, 172 (Alaska 1999)).

47. *Id.*

48. *Id.* (quoting *Chijide,* 972 P.2d at 172).

implied covenant of good faith and fair dealing when it accelerated its plans to open an additional Dodge dealership in south Anchorage. ACC first argues that the superior court failed to make any findings on remand on the issue of whether DCMC breached the covenant by opening the second Dodge franchise. In particular, ACC contends that the superior court did not consider evidence that there was "no market justification for a second Dodge [dealership] in Anchorage" and that in so doing DCMC "ignored its own procedures and acted [in a manner that was] inconsistent with general industry practices and good faith dealing." ACC alleges that DCMC opened the second Dodge dealership in South Anchorage out of a desire to retaliate against ACC for bringing its lawsuit.

ACC is correct that the superior court did not directly address, in its consideration of the breach of covenant arguments, the claim that DCMC violated its own procedures and industry practices when it opened the second Dodge dealership in south Anchorage. However, the superior court considered the breach of covenant arguments to be essentially a restatement of ACC's other claims, and the superior court had engaged, in an earlier section of its findings of fact and conclusions of law, in a lengthy discussion of the timeline of events leading up to, and the justifications for, DCMC's decision to open the second Dodge dealership. The superior court noted that DCMC's regional representative had communicated to his superiors a desire for a second Dodge dealer in south Anchorage in May 1998, and that the idea of a second Dodge dealership in Anchorage was being discussed as early as August 1996. The superior court also noted that Jim Dimond, the DCMC employee in Detroit responsible for market studies, visited Anchorage in October 1999 and, after reviewing additional information, "requested the opening of a second Dodge dealer in south Anchorage on 26 October." The superior court then found that "the events after May show that it was not a difficult process [to secure a second Dodge dealership in Anchorage] given the growth of competition and population in South Anchorage," and that "had Fleck not decided to delay the request for a market study of a second Dodge dealership until after Project 2000 he would likely have gotten the study and it would likely have approved the dealership months if not years before October."

These findings by the superior court—that the market conditions in Anchorage justified the addition of a second Dodge dealership, and that DCMC employees had been considering a second dealership for years prior to the conflict and litigation with ACC—are inconsistent with ACC's claims that DCMC added the second Dodge dealership in violation of its own procedures and industry practice and in retaliation against ACC. Therefore, although the superior court made these findings in a separate section, the findings informed its conclusion that DCMC's decision to open a second Dodge dealership in Anchorage did not violate the covenant of good faith and fair dealing.

ACC also contends that the superior court erred by not finding that DCMC breached the covenants of good faith and fair dealing by revoking the Wasilla letter of intent. ACC fails to assert any specific arguments as to why DCMC's revocation of the Wasilla letter of intent in November 1999 violated the covenant of good faith and fair dealing. In addition, ACC fails to refute the superior court's findings that "DCMC did not act precipitously in November 1999 or without a long history of conduct that made it more than reasonable for DCMC to understand that [ACC] was not going to perform as promised. [ACC's] own decisions, not DCMC's bad faith nondisclosure caused the cancellation of the Wasilla deal."

ACC also claims that DCMC breached the covenant of good faith and fair dealing by making additional unreasonable and arbitrary demands for exclusive facilities. ACC does not specifically anchor this claim in either the objective or the subjective elements of the covenant. Instead, ACC makes only the blanket allegation that "DCMC's unilateral demands were both objectively and subjectively inconsistent with the covenant of good faith." The superior court found that "DCMC did not make unreasonable demands for ACC's Anchorage facilities and operations" and, accordingly, concluded that

"DCMC did not violate the covenant of good faith and fair dealing in the revocation of ACC's ability ... to receive Jeeps." The superior court, therefore, supported its conclusion with findings based on the evidence in the record, and ACC failed to offer a specific legal basis for challenging the superior court's findings or conclusion.

ACC's strongest claim for establishing that DCMC breached the implied covenant of good faith and fair dealing, however, is the argument that it raised in the context of its discussion of the fraudulent misrepresentation issue: that, during the course of its Project 2000 negotiations with ACC, DCMC made fraudulent misrepresentations regarding its intentions to establish additional Dodge product lines in the Anchorage region. The superior court found that ACC established the first four elements of fraudulent misrepresentation (a misrepresentation, scienter, intent to induce reliance, justifiable reliance), but failed to establish the fifth element (loss).[49] While we found that all five elements were in fact satisfied, the first four elements alone appear to be sufficient to satisfy both requirements for ACC's claim of breach of the implied covenant of good faith and fair dealing. The objective element—which requires each party to act in a manner that a reasonable person would regard as fair[50]—is clearly met in this case because no reasonable person would regard DCMC's willful misrepresentation as fair. The subjective element—which prohibits one party from acting to deprive the other of the benefit of the contract[51]—is also satisfied in this case because ACC believed that it was contracting for peace in the form of assurances that DCMC would not open new dealerships or authorize the sale of additional Dodge product lines in the Anchorage area, but was deprived of this benefit when DCMC misrepresented its intentions.

DCMC permitted ACC to believe that the parties were negotiating to determine the distribution of all DCMC product lines in Anchorage under Project 2000, while all the while DCMC secretly intended to authorize the sale of at least one additional Dodge product line. As a result of this fraudulent misrepresentation, ACC never had the opportunity to play an actual, meaningful role in determining the distribution of DCMC product lines in Anchorage. Although the franchise agreements and Project 2000 agreements technically provided DCMC with the power to add dealerships and product lines to Anchorage without requiring the consent of ACC or any other dealers, once DCMC began negotiating with the dealers it had the responsibility to behave honestly and straightforwardly.

■ Although ACC does not directly argue in this appeal that DCMC's fraudulent misrepresentations themselves represented a breach of the implied covenant of good faith and fair dealing, the parties had a full opportunity to present arguments and evidence on all five elements of fraudulent misrepresentation, and the superior court made detailed findings in the process of concluding that DCMC's actions did satisfy the first four elements. The remaining question before us is the legal determination of whether those findings and conclusions are sufficient to satisfy the elements required to establish a claim for breach of the implied covenant. We conclude that those elements are satisfied. Accordingly, we hold that DCMC breached the implied covenant of good faith and fair dealing when it made fraudulent misrepresentations regarding its intention not to establish additional Dodge product lines in the Anchorage region.

■ We have previously indicated that the award of contract damages is an appropriate remedy in the case of a breach of the implied covenant of good faith and fair dealing.[52] As already discussed, however, ACC has not established any losses as a result of

---

**49.** *See Anchorage Chrysler Center I,* 129 P.3d 905, 914 (Alaska 2006) (citing the RESTATEMENT (SECOND) OF TORTS § 525 (1977)).

**50.** *McConnell,* 991 P.2d at 184.

**51.** *Id.*

**52.** *See ARCO Alaska, Inc. v. Akers,* 753 P.2d 1150, 1153–54 (Alaska 1988) (noting that we have only awarded contract damages in cases involving breach of the covenant of good faith and fair dealing implied in employment contracts).

DCMC's misconduct that would entitle it to more than nominal damages. A breach of the implied covenant of good faith and fair dealing does not by itself justify punitive damages.[53] We have already noted, however, that in this case the same underlying conduct might merit punitive damages because it also constituted the tort of fraudulent misrepresentation.

### D. The Superior Court Did Not Err in Finding that the May 21 Letter of Intent Was the Letter of Intent Contemplated in the May 28 Agreement.

ACC has consistently argued that DCMC breached the May 28 agreement by failing to provide a letter of intent regarding ACC's option to establish a dealership in Wasilla.[54] In the original trial the superior court found that DCMC had provided ACC with a draft letter of intent on May 21, and that although ACC might have interpreted the May 28 agreement as requiring DCMC to provide a subsequent letter of intent after the parties signed the May 28 agreement, "ACC never made that demand to DCMC." The superior court therefore concluded that "ACC breached the [May 28, 1999] Agreement when it failed to sign the Letter of Intent" and that "[t]hat breach excused DCMC's nonperformance of the portion of the agreement concerning a dealership in Wasilla." After reviewing the superior court's conclusion that ACC breached the May 28 agreement by not signing the May 21 letter of intent, we remanded for additional findings.[55] We gave the superior court specific directions:

> If it determines that both parties understood that the May 28 agreement referred to the May 21 letter of intent, then it should reject ACC's breach claim because it seems clear ACC never would have signed that letter of intent. If it believes that ACC had in mind a different letter of intent, and that DCMC was aware of this, then it should consider whether ACC im-

plicitly waived its right to receive this letter of intent by failing to complain when DCMC did not send a revised letter of intent. This would require a consideration of the circumstances surrounding the contentious period that followed the signing of the letter agreement under the standards for an implied waiver described above. If there was no waiver by ACC, then DCMC's failure to send a revised letter of intent would amount to a breach of its obligation under the letter agreement to supply a letter of intent. Finally, if the court concludes that the parties did not have a meeting of the minds on what constituted the letter of intent so vaguely identified in the May 28 letter agreement, then the court may choose to take briefing on what remedy should issue.[56]

On remand, the superior court found that "[t]he reasonable inference is that, when both parties signed the 28 May letter, they understood that the third bullet about the letter of intent referred to the 21 May letter of intent that already had been provided by DCMC to [ACC]." The superior court additionally found, however, that:

> DCMC could not reasonably believe that by signing the 28 May letter that [ACC] had agreed to all of the terms of the 21 May [letter of intent]. It did not. DCMC could only reasonably assume that [ACC] understood the 28 May letter to mean that the 21 May [letter of intent] was the starting point for what would become the final Wasilla [letter of intent].

Ultimately, the superior court concluded that ACC waived its right to modify the May 21 letter of intent through its lack of action, refusal to sign the letter of intent, refusal to offer alternative proposals to the letter of intent, and failure to demand any alternative letter of intent or terms in the May 21 letter of intent, and that "[t]his waiver and the refusal to sign the 21 May letter of intent was a breach of the 28 May agreement."

---

**53.** *Id.* at 1154.

**54.** *Anchorage Chrysler Center I,* 129 P.3d at 917 ("In its complaint, ACC claimed by implication that DCMC's failure to send a new letter of intent was a breach of contract.").

**55.** *Id.* at 917–18.

**56.** *Id.* at 918.

ACC now argues that the May 21 letter of intent was not the letter of intent contemplated in the May 28 agreement, and that the superior court erred by finding that it was. ACC also argues that the superior court erred by finding that ACC had a duty to request a new letter of intent or to propose or demand alternative terms to the letter of intent, and by finding that ACC waived its rights to the letter of intent by failing to meet this duty. DCMC contends that ACC's arguments are unavailing because the superior court's finding that both parties understood that the May 21 letter of intent was the one contemplated by the May 28 agreement is supported by the evidence. DCMC also asserts that the superior court correctly concluded that DCMC fulfilled its obligation by sending ACC a letter of intent (even though that letter of intent may have required some modification), and correctly concluded that ACC breached its obligations by not signing the letter or requesting modifications. We agree with DCMC.

First, the superior court supported its finding that both parties understood that the May 21 letter of intent was the letter of intent contemplated in the May 28 agreement with an extensive discussion and analysis of the events and interactions between the parties leading up to the May 28 agreement. This analysis covered events spanning more than two years, and included discussion of prior draft letters of intent and agreements from January 1999 and February 1999. This history of draft letters of intent and agreements is relevant to the superior court's ultimate conclusion both because it demonstrates that the parties had already discussed potential terms for the letter of intent, and because it establishes that the language in the May 28 letter agreement referring to the letter of intent in the future tense was an artifact of previous draft agreements. Therefore, the superior court did not err by concluding, based on support in the record and sound analysis, that the May 21 letter of intent was the letter of intent contemplated by the parties in the May 28 agreement.

Second, there is no logical inconsistency in the superior court's finding that the May 21 letter of intent was the letter of intent contemplated in the May 28 agreement, and that the May 21 letter of intent contained some terms that may have required additional negotiation. ACC argues that it was "internally inconsistent" for the superior court to find, on the one hand, that "the draft letter of intent of May 21 was the one contemplated in the parties' May 28 agreement, but on the other [to find that] the May 21 letter was not consistent with the parties' intent and was not 'final.'" This argument assumes that the letter of intent was intended to be final, but nothing in the May 28 agreement, which referred to the letter of intent only as DCMC's "standard five year Letter of Intent," suggested that this was to be a final letter of intent. It is reasonable to assume that a boilerplate agreement would require some additional negotiation and refinement, and therefore that the "standard five year Letter of Intent" contemplated by the May 28 agreement was not intended as a final letter of intent.

It is important to note that this conclusion is consistent with the first scenario we offered in our instructions to the superior court on remand—"that both parties understood that the May 28 agreement referred to the May 21 letter of intent"—and distinct from the second scenario we offered—"that ACC had in mind a different letter of intent, and that DCMC was aware of this."[57] Accordingly, the superior court was not required to "consider whether ACC implicitly waived its right to receive this [different] letter of intent by failing to complain when DCMC did not send a revised letter of intent."[58] Although it is possible that ACC hoped to amend one or more terms in DCMC's "standard five year Letter of Intent," the superior court did not err in finding that both parties understood the May 21 letter of intent to be the standard letter of intent contemplated in the May 28 agreement, and therefore also did not err by additionally finding that no further action was required of DCMC in the absence of a specific request by ACC to

**57.** *Id.*

**58.** *Id.*

negotiate the terms of the May 21 letter of intent.

By finding that both parties understood that the letter of intent referred to in the May 28 agreement was the May 21 letter of intent, and that the parties did not necessarily expect that the May 21 letter of intent would contain the final terms of the letter of intent, the superior court established that DCMC did not breach the May 28 agreement for failure to provide a letter of intent. The further implication of these findings was that ACC, in order to preserve its right to negotiate the letter of intent, had a duty to respond to the May 21 letter of intent. The superior court found that, despite numerous interactions with DCMC in the period immediately following the signing of the May 28 agreement, ACC never disputed the terms of the May 21 letter of intent, offered alternative proposals to the May 21 letter of intent, or demanded an alternative letter of intent. These findings offer sufficient support for the superior court's conclusion that the May 21 letter of intent was the letter of intent contemplated in the May 28 agreement, and that ACC breached the May 28 agreement by failing to sign the May 21 letter of intent. The superior court, therefore, did not err in reaching this conclusion.

### E. Additional Proceedings Are Required To Award ACC Nominal Damages, Consider Punitive Damages, and Reconsider Attorney's Fees.

After determining that DCMC was the prevailing party at trial, the superior court awarded DCMC twenty percent of the $1,783,513 in attorney's fees that DCMC incurred, for a total award of $356,702.60. Because we now hold that DCMC did breach the implied covenant of good faith and fair dealing and committed the tort of fraudulent misrepresentation, an award of nominal damages to ACC is required. Therefore, we vacate the superior court's determination that DCMC was the prevailing party and its award of attorney's fees in DCMC's favor.[59] On remand the superior court should award nominal damages to ACC, reconsider the question of who the prevailing party is in this action, and then award attorney's fees accordingly.[60]

 We have previously remanded a case to the superior court solely for entry of judgment for nominal damages in the amount of one dollar.[61] However, the superior court will also need to consider whether punitive damages are called for. We have previously stated that punitive damages are to be awarded with caution, after consideration of the severity of the wrongdoing and the need for deterrence: "Since punitive damages are assessed as an example and warning to others, and a primary concern of law is payment of just compensation for the wrong done, punitive damages are not favored in law. They are to be allowed only with caution and within narrow limits."[62] To support a claim for punitive damages, the plaintiff must show "by clear and convincing evidence that the defendant's conduct was outrageous, such as acts done with malice, bad motive, or reckless indifference to the interests of another."[63]

### V. CONCLUSION

We AFFIRM the superior court's conclusion that DCMC was not liable for breach of contract. We REVERSE the superior court's conclusions that DCMC did not breach the covenant of good faith and fair dealing and did not commit the tort of fraud-

---

**59.** *See Romulus v. Anchorage Sch. Dist.*, 910 P.2d 610, 619 (Alaska 1996) (vacating attorney's fee award and remanding for new determination of prevailing party status in light of decision to reverse superior court on issue of party's unpaid suspension).

**60.** *See Day v. Moore*, 771 P.2d 436, 437 (Alaska 1989) (granting superior court broad discretion in determining prevailing party).

**61.** *Zok v. State*, 903 P.2d 574, 579 (Alaska 1995) (declining to follow the approach adopted by

courts of other jurisdictions that have refused to reverse a judgment merely for the purpose of permitting the recovery of nominal damages).

**62.** *Alaska Placer Co. v. Lee*, 553 P.2d 54, 61 (Alaska 1976).

**63.** *Brandner v. Hudson*, 171 P.3d 83, 89 (Alaska 2007) (quoting *Chizmar v. Mackie*, 896 P.2d 196, 210 (Alaska 1995)); AS 09.17.020(b).

ulent misrepresentation. Accordingly, we REMAND to the superior court for an award of nominal damages to ACC and to consider whether to award punitive damages for fraudulent misrepresentation. We also VACATE the award of attorney's fees to DCMC. On remand, the superior court will need to reconsider prevailing party status and attorney's fees.

FABE, Chief Justice, not participating.